NOT DESIGNATED FOR PUBLICATION

No. 124,825

IN THE COURT OF APPEALS OF THE STATE OF KANSAS

In the Interests of K.M. and T.C.,
Minor Children.

MEMORANDUM OPINION

Appeal from Johnson District Court; ERICA K. SCHOENIG, judge. Opinion filed September 16, 2022. Affirmed.

*Richard P. Klein*, of Lenexa, for appellant natural mother.

*Elizabeth A. Billinger*, assistant district attorney, *Sommer Mackay*, legal intern, and *Stephen M. Howe*, district attorney, for appellee.

Before GREEN, P.J., ISHERWOOD and COBLE, JJ.

PER CURIAM: In December 2018 the district court adjudicated K.M. and T.C. children in need of care (CINC) and removed the children from Mother's custody. The family was reintegrated in November 2019, but the children were removed again by the following February. The case failed to progress in a positive fashion and the State ultimately moved to terminate Mother's parental rights. In December 2021, the district court found the children's best interests demanded termination of Mother's parental rights.

Mother appeals and advances three claims of error against the district court's decision. The first two are intertwined as she argues the court's conclusions that she was unfit and unlikely to become fit in the foreseeable future lacked a clear and convincing evidentiary foundation. Lastly, she argues that the court abused its discretion when it

1

unreasonably determined that the children's interests would be best served by termination of her parental rights. Following a comprehensive review of the evidence in a light most favorable to the State, as the party prevailing below, we are satisfied that the court's conclusion is buttressed by the requisite clear and convincing evidence. And further, when considering the children's mental, emotional, and physical health, it can be said that a reasonable person would have found termination to be in their best interests. The judgment of the district court is affirmed.

FACTUAL AND PROCEDURAL BACKGROUND

In November 2018, the State filed child in need of care (CINC) petitions for K.M. (YOB 2016) and T.C. (YOB 2018), supported by allegations that Mother recently tested positive for methamphetamines, marijuana, amphetamines, and PCP. It also alleged that T.C.'s father, C.C., visited Mother at her home in violation of a protection from abuse order that was entered against him in January 2018 following a domestic violence incident. The children were removed from Mother's residence on the same day the petitions were filed and placed into the custody of the Kansas Department for Children and Families (DCF).

On December 20, 2018, the district court found that K.M. and T.C. were CINC as defined in K.S.A. 38-2202(d)(1) (a child who "[i]s without adequate parental care, control or subsistence and the condition is not due solely to the lack of financial means of the child's parents or other custodian") and K.S.A. 38-2202(d)(2) (a child who "is without the care or control necessary for the child's physical, mental or emotional health"). Mother was provided with a six-month reintegration plan.

Mother regained custody of the children in November 2019, but they were removed again roughly three months later in the wake of a domestic violence incident perpetrated by C.C. The court ordered a new six-month reintegration plan.

Mother tried to work through her reintegration tasks, but as the months wore on, it became apparent from her lack of meaningful progress and the children's trauma-induced behavior while in daycare, school, and various foster homes, that the focus of the case needed to shift to a permanency plan beyond Mother.

The State filed a motion to terminate Mother's parental rights in December 2020 and the matter proceeded to a termination hearing in November 2021. The State called five witnesses, Emma Long, a child protection specialist for DCF; Christine Lenz, Mother's case manager through KVC; Megan Dieme, a mental health service provider at Keeler Women's Health; Jessica Banes, a case manager and service coordinator for Johnson County Mental Health; and Katie Ebbrecht, a permanency case manager with KVC.

Long explained that she first became acquainted with Mother at the start of 2017 upon receiving a report that she and K.M. were homeless. Long assisted with getting the family into the Salvation Army Lodge followed by Safehouse where they remained until December 2017.

According to Long, their paths crossed again in 2018 when Mother tested positive for cocaine and marijuana during T.C.'s birth. Mother worked with social service agencies to secure stable housing and family preservation services, as well as to obtain a protection from abuse order against C.C. following a violent domestic incident. Mother also struggled with substance dependency involving cocaine, crack, methamphetamine, and marijuana, so she also received assistance in locating substance abuse and mental health services. Unfortunately, Mother's situation failed to stabilize as her destructive relationships with narcotics and C.C. persisted.

3

Lenz testified to offer insight into Mother's reintegration plan and the areas that posed the greatest concerns. First, Mother struggled to maintain secure employment as required. During Lenz' time with the case Mother held three different jobs.

Of greater concern, reported Lenz, was Mother's inability to either formulate a transportation plan or secure a driver's license and fulfill all its attendant obligations, such as insurance and registration. According to Lenz, this factor was critical because K.M. has significant special needs that require the child to be transported for weekly appointments with various specialists. Those same challenges often prompt K.M. to act out inappropriately at school, resulting in early dismissals, so reliable transportation is needed to respond to those occurrences.

Lenz also addressed the physical and psychological obligations Mother was expected to satisfy. She explained that Mother needed to attend individual therapy to address her bipolar disorder and depression, as well as her history of trauma and domestic violence. Lenz testified that Mother attended individual therapy at one time but was discharged due to a lack of participation. This segment of Mother's reintegration plan also required that she submit to regular drug tests, the results of which revealed that Mother continued to use amphetamines and methamphetamine.

Finally, Lenz spoke on the visits Mother shared with the children. Mother was granted hour long, supervised visits with the children but her attendance was inconsistent. Mother often offered illness, car trouble, or work conflicts as explanations for her absences. But she nevertheless failed to truly appreciate the substantial emotional impact the missed visits had on the children, especially K.M.

Dieme was the next witness called by the State and testified regarding the individual therapy sessions she conducted with Mother. Dieme explained that Mother struggles with a major depressive disorder and possible PTSD as a result of abuse and trauma she suffered as a child.

Mother had seven sessions scheduled with Dieme but missed three, which prompted her placement on a waitlist only status, as per Dieme's policy. Dieme testified that Mother expressed a desire for healing and change, but she was concerned Mother lacked the organizational capabilities to make significant strides with her mental health, which is often a by-product of the types of psychological demons Mother battled.

Banes testified that her role as Mother's case manager and service coordinator was to shepherd Mother towards the specific resources that would be beneficial in assisting her with reaching her goals. She scheduled Mother for 50-minute meetings, but Mother was consistently only "minimal[ly]" engaged and lacked an understanding of the precise areas of her life that required improvements. While a handful of their sessions together extended to 30 minutes, typically the time Mother was willing to visit with Banes only averaged between 2 and 10 minutes.

Ebbrecht was Mother's permanency manager with KVC and adopted the case from Lenz. Thus, similar to Lenz, she testified about Mother's reintegration plan. She explained that Mother secured stable employment and housing but had not managed to maintain individual therapy. Rather, Mother expressed to Ebbrecht that she did not suffer from any mental health issues so there was no need for her to attend therapy or take medication for her bipolar disorder. Additionally, Mother continued to test positive for amphetamine usage. According to Ebbrecht, these factors signaled a warning for the children's safety if returned to Mother's home.

Further testimony from Ebbrecht revealed that transportation remained an issue, and she reinforced the importance of this matter to Mother given the children's special needs. Ebbrecht explained this was particularly critical for K.M. who required occupational and play therapy on top of the children's family therapy. Ebbrecht opined that K.M. and T.C. required a level of care that ranked "[h]igher than average."

Finally, Ebbrecht testified that while Mother truly loved her children and, overall, shared very pleasant interactions with them, Mother had attempted to complete her reintegration plan, but her required tasks remained largely incomplete. It was Ebbrecht's belief that the issues which resulted in Mother's inability to consistently visit the children and organize her own appointments were unlikely to change in the foreseeable future. Thus, given the increased level of care required for the children, it was in their best interests for Mother's parental rights to be terminated.

Mother was the final witness to testify at the termination hearing and informed the court she could offer the children stable housing and that her employment would enable her to adequately provide for them. She explained that it was hard managing her time with a full-time job, attending therapy, making car payments, and completing all of the additional KVC requirements. Additionally, Mother expressed frustration that the agencies failed to provide the assistance she requested and needed. She also claimed to have no understanding as to why her treatment with Dieme ended and that her efforts to contact Dieme went unheeded. According to Mother, she was currently participating in individual, as well as family therapy, and made significant progress. She requested that the court not terminate her rights and afford her added time to complete the reintegration plan.

The district court took the matter under advisement, then issued its ruling from the bench a few days later. It found mother unfit because she neglected to adjust her circumstances, conduct, or conditions in ways that ensured the needs of the children

would be met, K.S.A. 38-2269(b)(8); because she failed to maintain regular visitation or contact with the children, K.S.A. 38-2269(c)(2); and because she failed to carry out a reasonable, court-approved plan aimed at reintegrating the family while the children were out of her physical custody, K.S.A. 38-2269(c)(3). It further concluded that Mother's unfitness was unlikely to change in the foreseeable future, and that terminating her parental rights was in the best interests of the children.

Mother timely appealed.

ANALYSIS

THE DISTRICT COURT DID NOT ERR IN FINDING THAT MOTHER WAS UNFIT, HER CIRCUMSTANCES WERE UNLIKELY TO CHANGE IN THE FORESEEABLE FUTURE AND PROTECTION OF THE CHILDREN'S BEST INTERESTS REQUIRED TERMINATION OF HER PARENTAL RIGHTS.

Parents have a constitutionally recognized fundamental right to a parental relationship with their children. *Santosky v. Kramer*, 455 U.S. 745, 753, 758-59, 102 S. Ct. 1388, 71 L. Ed. 2d 599 (1982); *In re B.D.-Y.*, 286 Kan. 686, 697-98, 187 P.3d 594 (2008). In Kansas, when a child has been adjudicated as a child in need of care, a district court may terminate parental rights only upon findings of both present and foreseeable future unfitness, established by clear and convincing evidence. *In re E.L.*, 61 Kan. App. 2d 311, 323, 502 P.3d 1049 (2021); K.S.A. 2020 Supp. 38-2269(a). "Evidence is clear and convincing if it is 'sufficient to establish that the truth of the facts asserted is "highly probable."'" *In re E.L.*, 61 Kan. App. 2d at 322 (quoting *In re B.D.-Y.*, 286 Kan. at 695-96).

K.S.A. 38-2269(b) provides nine factors for the district court to consider when determining parental unfitness. Additionally, K.S.A. 38-2269(c) lists four factors for the district court to consider in those circumstances where the child is not in the physical

custody of the parent. Finally, K.S.A. 38-2269(f) explicitly states that "[t]he existence of any one of the above factors standing alone may, but does not necessarily, establish grounds for termination of parental rights." That is, when a district court bases its unfitness determination on multiple statutory factors, this court may affirm that the parent is unfit based on any single factor. *In re E.L.*, 61 Kan. App. 2d at 323.

*Standard of Review*

As noted previously, Mother brings two overarching claims for our review—whether the court erred in its unfitness findings and whether its decision about termination of her parental rights was unreasonable. Two different standards of review attend those two claims. First, a reviewing court will generally "uphold termination of parental rights under Kansas law if, after reviewing all the evidence in the light most favorable to the State (as the prevailing party), [it] deem[s] the district court's findings of fact to be highly probable, i.e., supported by clear and convincing evidence." *In re E.L.*, 61 Kan. App. 2d at 322 (citing *In re B.D.-Y.*, 286 Kan. at 705-06). In making its assessment, this court may not "reweigh conflicting evidence, pass on the credibility of witnesses, or redetermine questions of fact." *In re L.B.*, 42 Kan. App. 2d 837, 844, 217 P.3d 1004 (2009).

Next, unlike the clear and convincing evidence standard governing unfitness findings, the determination of whether termination of a parent's rights is in a child's best interests is inherently a judgment call, so this court reviews the decision for an abuse of discretion. *In re M.H.*, 50 Kan. App. 2d 1162, 1175, 337 P.3d 711 (2014). An abuse of discretion "occurs when no reasonable person would agree with the district court or the district court premises its decision on a factual or legal error." *In re R.S.*, 50 Kan. App. 2d 1105, 1116, 336 P.3d 903 (2014).

*The District Court's Unfitness Findings Are Supported by Clear and Convincing Evidence*

Mother's first argument is that there was not clear and convincing evidence to support the district court's finding that she was unfit and that her unfitness was unlikely to change in the foreseeable future. Essentially, she contends that she was not "irredeemably unfit" and that, in actuality, the evidence adduced at the termination hearing established that she sufficiently adjusted her circumstances to meet the children's needs, regularly visited and maintained contact with them, and substantially completed her reintegration plan.

Looking back at Long's testimony as a child protection specialist for DCF, who first became acquainted with Mother in January 2017 when she received a report that Mother and K.M. were homeless, reveals that various agencies were actively involved in attempting to preserve the family for a year before the CINC case was even filed. The children were then first removed from the home in December 2018. They remained in DCF custody for the next 11 months then briefly returned to Mother's care for three months when they were removed once again. The children moved through several different foster homes for the next 21 months until the termination hearing in December 2021. Collectively, the children were outside of Mother's physical custody for roughly 32 months.

A comprehensive review of the evidence discloses that from the time the children were removed from Mother's custody, until the time of the termination hearing, various agencies engaged in sustained efforts to aid Mother in her goal of reuniting with her children. Unfortunately, Mother made only minimal progress toward reintegration during the children's extended absence from the home. The evidence bears out that Mother suffers from bipolar disorder, depression, substance abuse, and possible PTSD due to extensive trauma endured during her formative years. Yet she resisted therapeutic efforts

despite the fact it was a required component of the reintegration plan. She often neglected to attend appointments with treatment providers or established a relationship with a new therapist, failed to follow through with a treatment schedule, and then simply moved to a different therapist. By the time of the termination hearing, Mother had adopted the position that she did not suffer from any mental health issues, so she did not need to attend therapy or take medication of any kind. Mother also continued to test positive for the use of amphetamines. Mother's inability or unwillingness to make her well-being a priority carries the potential to not only impact the family in obvious ways, but it also poses more nuanced consequences by robbing her of the presence of mind and organizational skills required to manage her obligations alongside the children's intensive schedules.

The evidence also reflects that a lack of reliable transportation or establishment of an alternative transportation plan was an issue from the inception of the case and throughout the months of reintegrative efforts. Mother's failure to remedy this concern in some fashion adversely impacts not only her ability to provide for the family's basic necessities, but also her ability to tend to the higher-than-average care the children required in the form of multiple appoints with specialists each week and frequent visits to the school to pick up K.M. when challenges created by his special needs induced him to act out. Mother has not shown that she can maintain her own schedule of therapy, visitations, and other obligations, and the district court properly concluded that this inability will only be compounded by adding the children's appointments. Thus, it was an obligation that would be difficult, if not impossible, for Mother to achieve. See *In re J.L.*, No. 117,529, 2018 WL 1247167, at *5 (Kan. App. 2018) (unpublished opinion) (finding that the district court did not abuse its discretion by finding that termination of parental rights was in the best interests of the children when the children had significant needs and the record supported the district court's finding "that Mother would likely be unable to consistently dispense the children's medications or provide transportation for appointments").

10

Finally, we turn to the matter of Mother's visitation with the children. Mother implores us to reach a different outcome because the district court's findings "border on the absurd." We recognize that Mother can provide explanations for her missed visits, but the considerably negative emotional impact those missed visits had on the children should have reinforced Mother's desire to be present, but it seemingly did not. Of particular concern, Mother missed visits because her phone did not work, she double booked the time slot, and she was confused and could not locate the KVC office, even though she visited that location previously. In one instance Lenz described a missed visit in a park where Mother failed to show up and when attempting to call her, Mother's phone was turned off. These latter examples reaffirm the concern that Mother experiences difficulty managing her schedule to the emotional detriment of the children.

We acknowledge that Mother views the facts of the case through a distinctly different lens. But again, we are required to review the evidence in a light favoring the State, as the party prevailing in the district court. In doing so, we find it strongly supports the conclusion that Mother failed to adjust her circumstances to meet the children's needs, failed to maintain regular visitation or contact with the children, and that Mother failed to carry out a reasonable court-approved plan aimed at reintegration. Additionally, in determining whether Mother's conduct was likely to change in the foreseeable future, we are to consider "the foreseeable future . . . from the child's perspective, not the parent['s], as time perception of a child differs from that of an adult." *In re S.D.*, 41 Kan. App. 2d 780, Syl. ¶ 9, 204 P.3d 1182 (2009); accord *In re D.T.*, 30 Kan. App. 2d 1172, 1174-75, 56 P.3d 840 (2002); see K.S.A. 38-2201(b)(4). As noted, these children were absent from the home for a combined total of about 32 months. In that time, Mother failed to make meaningful progress toward the completion of her reintegration tasks. There is no indication that a different outcome would manifest in an abbreviated future time period, as would be consistent with the concept of child time.

11

*The District Court Did Not Abuse Its Discretion in Determining that the Children's Best Interests Supported Termination of Mother's Parental Rights*

Mother's second claim of error on appeal is that it was unreasonable for the district court to proceed to termination given that the evidence at the termination hearing established that reintegration of the family was a more favorable option than the uncertain future the children would face once her rights were severed. We find no abuse of discretion here as a reasonable person could agree with the district court's conclusion.

Once a court determines that a parent is unfit and unlikely to change in the foreseeable future, a court must also assess whether termination is in the best interests of the child. K.S.A. 38-2269(g)(1). "In making the determination, the court shall give primary consideration to the physical, mental and emotional health of the child." K.S.A. 38-2269(g)(1). The district court is best situated to "'evaluate the complexities of the situation and to determine the best interests of the children . . . .'" *In re R.S.*, 50 Kan. App. 2d at 1115 (quoting *In re Marriage of Bradley*, 258 Kan. 39, 45, 899 P.2d 471 [1995]). "In so doing, the court must weigh the benefits of permanency for the children without the presence of their parent against the continued presence of the parent and the attendant issues created for the children's lives." *In re K.R.*, 43 Kan. App. 2d 891, 904, 233 P.3d 746 (2010). Here, the district court found that terminating Mother's parental rights was in the best interests of the children because the children had not achieved permanency in nearly three years and adoption was a viable option.

There are three separate facets to Mother's argument. First, she contends that the children do not have a permanency resource and terminating her parental rights "would mean severing a meaningful relationship the children have with their mother and hoping for the best with some unknown, random family." Mother is correct that a permanency resource was not identified at the time of the termination hearing, but, as the district court pointed out, Ebbrecht testified that she believed the children were adoptable. The added

fallacy in Mother's argument is that Mother was likewise unavailable as a permanent resource for the children. This case was pending for nearly three years, yet Mother could not complete the steps necessary to establish a home for the children that would meet their physical, social, and mental health needs. Unfortunately, in order to optimize their chances for permanency, it was necessary that this case be closed through termination of Mother's parental rights.

Next, Mother argues that the children were reintegrated before and the only reason that they were removed, domestic violence, is no longer an issue. Still, the lack of one factor detrimentally affecting the children's physical, mental, and emotional health does not eliminate the other factors in the equation that were equally troubling. Mother's inability to resolve the transportation matter and make a firm commitment to addressing her considerable mental health issues were likewise significant factors that informed the determination.

Third and finally, Mother argues that the family is bonded and Mother "loves her children and her children love her." This is no doubt true and has never been in question. We also recognize that the foundation on which Mother stands is her completion of a portion of the requirements, such as securing a stable home and employment. Despite how she might perceive our conclusion, we did not turn a blind eye to those accomplishments. Even so, observations set forth in another case are equally true here:

> "Cases like this are difficult ones. A parent may be labeled 'unfit' under the law even though he or she loves the child and wants to do the right thing, which may be the case here. But we must judge these cases based mostly upon actions, not intentions, and we must keep in mind that a child deserves to have some final resolution within a time frame that is appropriate from that child's sense of time." *In re A.A.*, 38 Kan. App. 2d 1100, 1105, 176 P.3d 237 (2008).

13

The district court's unfitness findings were supported by clear and convincing evidence, and it did not abuse its discretion in concluding that termination of Mother's parental rights was in the children's best interests. We therefore affirm the district court's judgment.

Affirmed.